# NOTARIAL CERTIFICATE

I, the undersigned Notary Public Dr. Friedrich Strube with office at Bremen / Germany, hereby certify that the attached photostat copy is a true and complete photostat copy of the certified original copy of the judgment issued by the Regional Court [Landgericht] Hamburg under date of 27th September 2006.

Bremen, 2nd February 2007

Dr. Strube
Notary Public



9101 E Nr. 340/2007

**APOSTILLE**

(Convention de La Haye du 5 octobre 1961)

1. Land: Bundesrepublik Deutschland

Diese öffentliche Urkunde

2. ist unterschrieben von Dr. Friedrich Strube

3. in seiner Eigenschaft als Notar

4. sie ist versehen mit dem Siegel/Stempel des (der) Notars

Bestätigt

5. in Bremen      6. am 05. FEB. 2007

7. durch den Landgerichtspräsidenten Golasowski

8. unter Nr. 274/2007

9. Siegel/Stempel      10. Unterschrift:



Blaum · Dettmers · Rabstein
Rechtsanwälte & Notare

Eingang: 28. Sep. 2006

Fristablauf: 16.10./30.10./
28.11.06

Landgericht Hamburg

U R T E I L

Im Namen des Volkes

| Geschäfts-Nr.: | Verkündet am: |
| --- | --- |
| 417 O 230/05 | 27.9.2006 |

Pfeiffer,
als Urkundsbeamter
der Geschäftsstelle

In der Sache

**Delta Lloyd Schadeverzekering N.V.**,
vertreten durch ihre Direktoren, Spaklerweg 4, 1096 BA Amsterdam,
KÖNIGREICH DER NIEDERLANDE

- Klägerin -

Prozessbevollmächtigte        Rechtsanwälte **Hasche pp.**,
Stadthausbrücke 1-3, 20355 Hamburg,
Gz.: MSc-mk-2005/16337, GK.: 180

gegen

**Gericke GmbH Internationale Spedition**,
vertreten durch den Geschäftsführer Alfons Scherer,
Ohmstraße 1, 08496 Neumark

- Beklagte -

Prozessbevollmächtigte        Rechtsanwälte **Scheer und Stahmer**,
Burchardstraße 17, 20095 Hamburg,
Gz.: I/GR/tb 06-0012,

1)  **J.H. Bachmann GmbH**,
    vertreten durch den Geschäftsführer Carl Salfeld,
    Schlachte 15-18, 28195 Bremen

- Nebenintervenient -



Prozessbevollmächtigte zu 1:    Rechtsanwälte **Blaum pp.**,
Am Wall 153 - 156, 28195 Bremen,
Gz.: 16-1901/04JFB/do,

- 1a -

erkennt das **Landgericht Hamburg, Kammer 017 für Handelssachen**
auf die mündliche Verhandlung vom 14.6.2006

durch

den Vorsitzenden Richter am Landgericht Müller-Fritsch
als Vorsitzenden
Handelsrichter Dr. Möhlmann und Saecker

1 L

417 O 230/05

für Recht erkannt:

1. Die Beklagte wird verurteilt, an die Klägerin € 652.017,03 zuzüglich Zinsen in Höhe von 5 Prozentpunkten über dem jeweiligen Basiszinssatz ab dem 21.12.05 zu zahlen.

2. Im übrigen wird die Klage abgewiesen.

3. Von den außergerichtlichen Kosten der Klägerin, den außergerichtlichen Kosten der Beklagten sowie den Gerichtskosten haben die Klägerin 14 % und die Beklagte 86 % zu tragen. Die außergerichtlichen Kosten der Nebenintervenientin fallen ihr selbst zu 86 % und zu 14 % der Klägerin zur Last.

4. Das Urteil ist gegen Sicherheitsleistung in Höhe von 110% des jeweils zu vollstreckenden Betrages vorläufig vollstreckbar.

**Tatbestand**

Die Klägerin, eine niederländische Versicherung, verlangt von der Beklagten Ersatz für Schäden an einem Transformator, der auf der letzten Strecke eines Transports von Regensburg nach Anchorage von einem Tieflader gefallen ist.

1. Die Klägerin bringt vor, sie sei im Jahre 2004 führende Transportversicherung der Fa. SGB GmbH gewesen. Die Mitversicherer hätten sie bevollmächtigt, den Schaden im eigenen Namen geltend zu machen. Sie habe den Schaden ausgeglichen und ihr seien die Ansprüche abgetreten worden.

Die Fa. SGB habe im Jahre 2004 zwei Transformatoren an die Fa. Chugach in Anchorage zum Preis von zusammen US$ 1.678.848.- verkauft und sich zur Lieferung frei Haus an die Baustelle in Anchorage verpflichtet. Mit dem Transport habe sie die Beklagte beauftragt, und zwar nach dem Rahmenvertrag vom

17./27.5.04 entweder zu einem gesamten Pauschalpreis oder jedenfalls zu Pauschalpreisen für jeden Transportabschnitt.

Die Beklagte habe mit dem Transport die Nebenintervenientin Bachmann beauftragt, die die beiden Transformatoren in neuem, geprüften und funktionsfähigen Zustand übernommen habe. Auf der Fahrt in Alaska von der Bahnstation zur vorgesehenen Abladestelle bei der Empfängerin sei einer der Transformatoren von dem Tieflader gefallen und habe dadurch einen Totalschaden erlitten. Die von Sachverständigen festgestellten Ursachen hierfür seien eine nicht hinreichende Verkehrssicherheit des benutzten Tiefladers, eine deutliche Überladung des Fahrzeugs, eine nicht mittige Beladung, ungeeignete und verrostete Trossen und schwere Fehler des (vertragswidrig einzigen) Fahrers beim nächtlichen und durch Schneefall erschwerten Einbiegen in eine unebene Seitenstraße.

2. Die Klägerin beantragt deshalb mit der am 21.12.05 zugestellten Klage,

   a. die Beklagte zu verurteilen, an die Klägerin € 760.252,49 nebst Zinsen in Höhe von 5 Prozentpunkten über dem Basiszinssatz ab Klageerhebung zu zahlen und

   b. hilfsweise: die Beklagte zu verurteilen, ihre Ansprüche aus dem mit der Nebenintervenientin geschlossenen Frachtvertrag über den Transport zweier Transformatoren von der Klägerin [gemeint: Fa. SGB] an die Chugach Electric Association Inc., 5601 Minnesota Drive, Anchorage, Alaska 99516300 USA (Verladetag 18.10.2003) wegen und im Zusammenhang mit der Beschädigung des Transformators Nr. 101851 an die Klägerin abzutreten.

Die Beklagte und die Nebenintervenientin beantragen gegenüber beiden Anträgen,

   die Klage abzuweisen.

3. Die Beklagte bringt vor, die Klägerin habe ihre Befugnis, die Klage zu führen, nicht hinreichend nachgewiesen, weshalb sie die Befugnis mit Nichtwissen bestreiten müsse. Auch die Zahlung sei nicht nachgewiesen und die Abtretung unwirksam.

Die Beklagte sei lediglich mit der speditionellen Abwicklung, nicht aber mit einem Frachtauftrag betraut worden; es seien weder Pauschalen vereinbart noch berechnet worden. Ansprüche könnten daher allenfalls gegenüber der Nebenintervenientin bestehen, die von der Beklagten mit der eigentlichen Durchführung des Transports beauftragt worden sei; die Beklagte habe hierbei eine untadelige Fachfirma ausgesucht.

Dass der Transformator bei der Abholung in Ordnung gewesen sei, müsse ebenso wie der Umfang der angeblichen Schäden mit Nichtwissen bestritten werden. Das Schadensereignis sei weder auf ein untaugliches Fahrzeug noch auf eine unrichtige oder unzureichende Beladung oder Sicherung oder Fahrfehler des Fahrzeugführers zurückzuführen, sondern nicht zu vermeiden gewesen. Jedenfalls falle den Beteiligten keine Leichtfertigkeit oder grobe Fahrlässigkeit, schon gar nicht Vorsatz zur Last.

Die Nebenintervenientin hat sich im wesentlichen dem Vortrag der Beklagten angeschlossen.

4. Wegen des übrigen, sehr umfangreichen Vortrags der Parteien wird auf die von ihnen eingereichten Schriftsätze nebst Anlagen Bezug genommen. Außerdem werden weitere Einzelheiten, insbesondere zum Inhalt der Anlagen und zur Höhe der Ansprüche noch in den Entscheidungsgründen – jeweils abgegrenzt zur rechtlichen und tatsächlichen Bewertung – geschildert. Die nach dem Schluss der mündlichen Verhandlung vom 14.6.06 eingegangenen Schriftsätze der Klägerin vom 14.7.06 und 16.8.06, der Beklagten vom 19.7.06 sowie der Nebenintervenientin vom 18.7.06, 24.7.06, 18.8.06 und 4.9.06 sind zur Kenntnis genommen worden.

## Entscheidungsgründe

I. Die zulässige Klage ist überwiegend begründet.

1. Die Klägerin ist zur Durchsetzung der Ansprüche befugt.

4

a. Sie hat durch die Versicherungspolice Anlage K4 (niederländisch) bzw. K4a (deutsch) nachgewiesen, dass sie Transportversicherin der Fa. Tessag SGB GmbH ist. Zwar ist die Vertragspartnerin der Fa. Chugach die Fa. SGB. Diese ist aber, wie die notarielle Urkunde vom 23.5.01 ausweist (K16), mit der Tessag SGB GmbH identisch.

Die Klägerin hat in Höhe von € 720.240.24 die Fa. Smit befriedigt. Die Fa. Smit hatte die Fa. Tessag SGB GmbH bei dem Vertrag vertreten (K1) und nahm die Zahlung für diese entgegen. Die Zahlung ist durch die Belege K23 nachgewiesen; auf ihr früheres Bestreiten der Zahlung ist die Beklagte nach der Vorlage dieses Beleges nicht mehr zurückgekommen.

Durch die Zahlung sind die Ansprüche nach Art. 284 des niederländischen Handelsgesetzbuches auf alle Versicherer anteilig übergegangen.

b. Die Klägerin ist von allen Mitversicherern ermächtigt worden, die Ansprüche im eigenen Namen durchzusetzen (Erklärungen K13). Soweit die Beklagte entgegen den schriftlichen Erklärungen noch bestreitet, dass die richtigen Zeichnungsberechtigten unterzeichnet hätten, geht das Gericht diesem Einwand nicht mehr nach. Die Beklagte hat mit nichts dargestellt, weshalb dieser fernliegende Einwand erhoben wird und dass tatsächliche Anhaltspunkte hierfür vorlägen. Die Klägerin war ausweislich der Police (letzte Seite) sogar berechtigt, die Police im Namen der Mitversicherer zu zeichnen.

Bei der Ermächtigung handelt es sich um eine gewillkürte Prozessstandschaft (BGH NJW 1981, 2640; OLG München, TranspR 1997, 193, 194; Koller, Transportrecht, 5. Auflage 2004, § 425 HGB Rdn. 55), die zulässig ist, sobald die Versicherungen den Schaden beglichen haben.

Auf die Abtretungen der Fa. Smit vom 17.11.05 (K11) und der Fa. SGB vom 18.11.05 (K12) kann und braucht die Aktivlegitimation nicht gestützt werden; sie sind nach der Zahlung vom 17.3.05 und 23.5.05 (K23) und damit nach dem von der Klägerin selbst

vorgetragenen Rechtsübergang auf die Versicherer nach niederländischen Recht erfolgt (entspr. § 67 VVG).

2. Der Klägerin bzw. ihren Mitversicherern steht ein Anspruch dem Grunde nach aus dem zwischen der Fa. Tessag SGB und der Beklagten zu.

a. Dabei handelt es sich um einen Speditionsvertrag nach den §§ 453 ff HGB, der, weil er in Deutschland zwischen deutschen Firmen geschlossen wurde, deutschem Recht unterliegt. Ein Speditionsvertrag ist es deshalb, weil die Beklagte es nur übernommen hatte, für die Versendung der Transformatoren zu sorgen und keine Verpflichtung übernommen hatte, dies persönlich auszuführen.

Indessen haftet die Beklagte wie ein Frachtführer, denn sie hat die Beförderung zu einem Preis vereinbart, der die Beförderung einschließt (§ 459 I HGB). Dies ergibt sich zwar nicht aus dem Rahmenvertrag vom 17./27.5.04 (K3), weil dieser Vertrag keine Preise festlegt. Auch die dazugehörige Preisliste (K18) mit den vereinbarten festen Frachtraten ist nicht maßgebend, weil sie nur für Transporte bis zu 1.100 km gilt. Eine schriftliche Vereinbarung für diesen Transport gibt es nicht und der Inhalt der mündlichen Vereinbarungen ist streitig. Das Gericht schließt die Vereinbarung fester Kosten aber aus der Rechnung der Beklagten (K25), weil die Beklagte nicht vorbringt, vertragswidrig abgerechnet zu haben.

Die Abrechnung der Beklagten berechnet jeweils Pauschalen für die einzelnen Transportabschnitte, in einem Fall auch den Aufwand für Erschwerungen bei einem Transportteil. Die Vereinbarung solcher Pauschalen steht der Vereinbarung einer Gesamtpauschale gleich (BGH NJW-RR 1999, 680, 683 = BGH BB 1999, 812f. = TranspR 1999, 164f.); entscheidend ist nämlich, dass eben nicht vereinbart worden ist, dass der Spediteur lediglich die ihm entstandenen Aufwändungen weiter berechnet und eine Provision hinzusetzt, sondern dass eine Pauschale aus Aufwändungen und eigenem Verdienst angesetzt wird. Von einer Provision ist auch in dem Rahmenvertrag (K3), der im Grundsatz auf für diesen Transport gilt (Schwertransporte sind erst ab dem 1.7.04 ausgenommen und der hier streitige Vertrag wurde vorher geschlossen) an keiner Stelle die Rede.

b. Die Haftung der Beklagten ergibt sich aus § 425 HGB. Nach dieser Vorschrift haftet der Frachtführer für den Schaden, der durch den Verlust oder die Beschädigung des Gutes in der Zeit von der Übernahme zur Beförderung bis zur Ablieferung entsteht.

Es handelte sich hier um einen Transport mit mehreren unterschiedlichen Beförderungsmitteln (sog. multimodaler Transport), nämlich mit dem LKW von Regensburg nach Antwerpen, mit dem Schiff nach Tacoma, USA, mit der Bahn nach Anchorage, USA und von dort zum Ablieferort in Anchorage mit dem LKW. Sofern bei einem solchen Transport der Schadensort bekannt ist, ist für Haftung das Recht anwendbar, das für die betroffene Teilstrecke anzuwenden wäre, § 452a HGB. Die Beschädigung ist unstreitig auf der letzten Teilstrecke während eines Transportes auf dem Tieflader, also einem Kraftfahrzeug entstanden. Bei der Ermittlung des Teilstreckenrechts kommt es nicht auf das konkrete, tatsächlich vereinbarte Recht des multimodalen Vertrages, sondern auf das hypothetische Teilstreckenrecht an, das ohne eine Vereinbarung gegolten hätte; das anzuwendende Sachrecht ist nach Art 28 EGBGB, Art 6 EGHGB isoliert in Bezug auf die Teilstrecke zu ermitteln (Koller, TranspR, 5. Auflage, § 452a HGB, Rdn. 5 mwN.).

Die Kammer hält nach diesen Kriterien das deutsche Recht für anwendbar. Die Parteien des Frachtvertrages haben beide ihren Sitz in Deutschland und sind nicht nur durch diesen konkreten Frachtvertrag miteinander verbunden, sondern auch durch den Rahmenvertrag, der der Beklagten die gesamte Versandlogistik übertrug und auf den unzweifelhaft deutsches Recht gelten sollte. Das Recht der USA bzw. des Bundesstaates Alaska hat keine der Parteien als maßgebliche Rechtsgrundlage in Betracht gezogen.

Es geht dem deutschen Recht auch kein internationales Recht vor. Da es sich bei dieser Teilstrecke nicht um eine Fahrt in zwei Staaten handelte, sind nicht die Vorschriften der CMR anzuwenden, Art 1, 2 CMR.

Es bleibt daher bei der Anwendung des deutschen Rechts und der Haftung aus § 425 HGB.

7

Der Schaden an einem der Transformatoren ist, wie § 425 I HGB verlangt, unstreitig zwischen dem Zeitpunkt der Übernahme des Gutes und seiner Ablieferung eingetreten.

c. Eine Haftungsbefreiung ist nicht eingetreten. Zunächst beruft sich die Beklagte weder auf Verpackungsmängel (§ 427 I 2 HGB) noch – weil sie das Laden selbst veranlasst hat – auf Ladungsmängel (§ 427 I 3 HGB). Auch dass die Beschädigung durch Umstände verursacht worden sei, die sie (bzw. ihre Subunternehmer) nicht vermeiden oder deren Folgen unabwendbar gewesen seien (§ 426 HGB), lässt sich dem Vortrag der Beklagten und der Nebenintervenientin nicht entnehmen.

Sie bestreiten zwar alle von der Klägerin unter Bezugnahme auf die Schadensgutachten behaupteten Ursachen, erklären aber selbst den Umstand, dass der Transformator vom Tieflader gefallen ist, schlicht überhaupt nicht. Nur die Nebenintervenientin räumt ein, es könne vielleicht ein Fahrfehler des Fahrers Crowson (zu enges Durchfahren der Linkskurve beim Einbiegen auf den letzten Weg zur Abladestelle) zum Herabfallen beigetragen haben.

d. Es kann dahinstehen, ob sich die Beklagte und die Nebenintervenientin auf die Haftungsbeschränkung der § 431 I HGB berufen können. Nach diesen Vorschriften beschränkt sich die Entschädigung auf 8,33 Rechnungseinheiten (Sonderziehungsrechte des Internationalen Währungsfonds) pro kg Rohgewichts der Sendung.

Hinsichtlich der Höchstgrenze der Haftung kommt es auf den Wert der Rechnungseinheit am Tag der Urteilsverkündung an (BGH NJW-RR 1997, 1121, 1122). Eine Erhebung bei dem Transport-Informations-Service der Deutschen Transportversicherer (www.tis-gdv.de) hat ergeben, dass die Rechnungseinheit am Tage der Verkündung dieses Urteils jedenfalls über € 1,10 betrug. Das Rohgewicht des Transformators betrug ausweislich der Rechnung (K24) 210.300 lbs (andere Quellen berichten von 234.000 lbs), was einem Gewicht von 95.390,59 kg entspricht. Die Höchstentschädigung beträgt also jedenfalls über € 874.064.-.

Die geltend gemachte Entschädigung liegt unter diesem Betrag.

8

e. Eine weitere Haftungsbegrenzung nach Ziffer 23 ADSp kann die Beklagte nicht für sich in Anspruch nehmen. Nach Ziffer 21.1.3. ADSp wäre die Entschädigung bei einer Beförderung unter Einschluss einer Seebeförderung auf 2 Rechnungseinheiten pro kg des betroffenen Ladungsteiles beschränkt.

Zwar heißt es in dem Rahmenvertrag (K1), die Beklagte arbeite auf der Grundlage der ADSp. Hierbei handelt es sich aber nach der nicht bestrittenen Darstellung der Klägerin um einen Teil einer Allgemeinen Geschäftsbedingung, die ADSp selbst sind Allgemeine Geschäftsbedingungen (Koller, a.a.O., vor Ziff. 1 ADSp, Rdn. 1). Nach § 452a HGB kommt nur das positive Recht zur Anwendung, wozu der abgeschlossene Vertrag und Allgemeine Geschäftsbedingungen nicht gehören (Koller, a.a.O., Rdn. 5).

Außerdem ist diese Haftungsbeschränkung nicht wirksam vereinbart worden. Es kann schon zweifelhaft sein, ob diese bloße Mitteilung auch Rechte der Fa. Tessag SGB beschränken sollte. Eine Herabsetzung der gesetzlichen Mindestentschädigung wäre in Allgemeinen Geschäftsbedingungen nach § 449 II 1 HGB jedenfalls nur dann wirksam, wenn hierauf in drucktechnisch deutlicher Gestaltung hingewiesen worden wäre, und zwar sowohl in der gedruckten Fassung der ADSp (die die Beklagte gar nicht vorgelegt hat) als auch nochmals im Vertrag selbst (Koller, a.a.O., § 449 Rdn. 62). Das ist hier nicht der Fall.

3. Der Höhe nach beansprucht die Klägerin zu Recht einen Teilbetrag von € 630.895,58 (die Berechnung lässt sich auch aus der diesem Urteil als Anlage beigefügten Tabelle ersehen).

a. Dies betrifft zunächst den Transformator selbst. Diesen hatte die Fa. SGB ausweislich des Vertrages vom 4.1./4.5.04 (K1) (als Teilbetrag von zwei gleichen Transformatoren) für US$ 1.678.848.- / 2 = 839.424.- US$ verkauft. Weshalb es in der Handelsrechnung Anlage K24 heißt, jeder Transformator koste US$ 840.972.-, hat die Klägerin nicht erläutert. US$ 839.424.- entsprechen bei dem zwischen den Parteien unstreitigen Umrechnungskurs von US$ 0,7552 pro 1,000 € der Summe von € 633.933.-

Das Gericht geht davon aus, dass der Transformator zum Zeitpunkt der Übernahme durch die Beklagte bzw. deren Subunternehmer fehlerfrei war. Dies haben die Beklagte und die Nebenintervenientin zwar zunächst bestritten, aber dieses Bestreiten nach Vorlage der Prüfprotokolle (K27) nicht mehr aufgegriffen. Für dieses Bestreiten haben beide auch keinerlei Anlass mitgeteilt, insbesondere haben sie nicht vorgetragen, dass der zweite, zeitgleich gelieferte und völlig gleiche Transformator nicht funktionstüchtig gewesen sei.

Das Gericht geht auch davon aus, dass an dem Transformator ein Totalschaden eingetreten ist. Dies hat die Klägerin unter Vorlage zahlreicher Fotos vom Innenleben des Gerätes sowie des Sachverständigengutachtens (K19) überzeugend dargetan und die Beklagte, die das zunächst bestritten hatte, hat hierzu nichts mehr erwidert. Dies hätte ihr aber oblegen, denn die dem Schadensfall nachfolgende Untersuchung hat entweder in Gegenwart ihrer Subunternehmer stattgefunden oder sie hatten jedenfalls Gelegenheit, sich selbst oder durch ihre Subunternehmer den Schaden genauer anzusehen. Sie können sich deshalb nicht auf ein Bestreiten mit Nichtwissen zurückziehen.

b. Von diesem Schaden hat die Klägerin entsprechend der Darstellung in den Gutachten K19 Ersparnisse durch nicht gebrauchten Teile in Höhe von US$ 40.752,67 (entspricht € 30.776,42) abzüglich hierfür angefallene Rücktransportkosten von US$ 10.400.- (entsprechend € 7.582,21) und Lagerkosten von US$ 600.- (entsprechend € 453,12) abgesetzt und Reparaturkosten für den Schockrekorder hinzugefügt (US$ 632,52 entsprechend € 477,68). Ferner hat sie Ersparnisse für nicht ausgeführte Arbeiten in Höhe von US$ 5.160.- (entsprechend € 3.896,83) abgesetzt und den Resterlös aus dem Verkauf des beschädigten Transformators (US$ 16.880.- entsprechend € 12.747,78). Hierzu hat sich die Nebenintervenientin nicht geäußert und die Beklagte hat die einzelnen Beträge nur pauschal mit Nichtwissen bestritten. Dies reicht nicht aus. Zu allen diesen Positionen hat die Klägerin in Anlage K19 die dazu gehörigen Rechnungen vorgelegt, zu denen die Beklagte sich nur pauschal und nicht im einzelnen verhalten und keine einzelne Position angegriffen und ihr Bestreiten erläutert hat. Es handelt sich allesamt letztlich

10

um Beträge, die den Schadensbetrag hinsichtlich des Transformators nur vermindern.

Das Gericht geht deshalb hinsichtlich des Transformators allein von einer bereinigten Schadenssumme von US$ 787.903,85 (entsprechend € 595.024,99) aus.

c. Hinzuzusetzen sind die Bergungskosten. Zwar gehören Bergungskosten im Grundsatz nicht zu den nach § 432 HGB zu ersetzenden Kosten (§ 432 S. 2 HGB, Koller, a.a.O., § 432 Rdn. 9), jedoch sind diese Kosten im vorliegenden Fall zugleich nach § 430 HGB ersatzfähige Schadensfeststellungskosten. Der Transformator musste, um das genaue Ausmaß der Beschädigung festzustellen, genauer untersucht werden. Das konnte, wie die Bilder zeigen, nicht alsbald vor Ort ausgeführt werden, weil der Transformator mitten auf einer belebten Straßenkreuzung lag.

Hierzu verlangt die Klägerin unter Vorlage der diesbezüglichen Rechnung (K19) US$ 39.400.- (entsprechend € 29.754,88). Auch hierzu beschränkt sich die Beklagte auf ein pauschales Bestreiten, was nicht ausreicht. Ihr Subunternehmer war in die Schadensbeseitigung involviert (er hat den Transformator zurücktransportiert) und konnte sich von den einzelnen getroffenen Maßnahmen (Bergung durch einen Kran) überzeugen. Die Beklagte legt nicht dar, ob sich sie sich insoweit kundig gemacht hat und weshalb sie der Ansicht ist, die berechnete Vergütung sei nicht angemessen.

d. Hinzuzusetzen sind ferner die der Fa. SGB entstandenen Besichtigungs- und Gutachtenkosten (OLG Düsseldorf, TranspR 1984, 16,17; OLG Hamm, TranspR 2000, 361f.).

Hierzu verlangt die Klägerin für eine Besichtigung durch die Fa. Shermann & Associates Inc., die der Fa. SGB eine erste Aufklärung über den Vorgang gab (K9c), die Bezahlung der Rechnung (K9) über US$ 4.850.- (entsprechend € 3.663,72) und für die Besichtigung durch die Fa. Electricial Rechnologies & Suppl Inc., die den Umfang der Schäden feststellte (K9h), die Zahlung der Rechnung über US$ 3.248,14 (entsprechend € 2.453.-).

11

Beide Positionen sind dem Grund nach ersatzfähig. Die zuverlässige Feststellung des Schadenshergangs war unerlässlich, weil sich der Fahrer des Subunternehmers der Beklagten sich den Feststellungen entzogen und sich nachts von der Unfallstelle davongemacht hatte, ohne die Polizei zu informieren. Dieses durch Presseberichte belegtes Vorbringen der Klägerin ist unstreitig geblieben. Die Feststellung des Schadensumfangs konnte nur durch sachkundige Personen vor Ort geschehen, war für die Verwertung des verunglückten Transformators nötig und war günstiger als die Anreise durch Mitarbeiter der Fa. SGB.

Zur Höhe sind die Einwändungen der Beklagten und der Nebenintervenientin aus bereits erörterten Erwägungen unbeachtlich.

Insgesamt ist daher eine Schadenssumme von US$ 835.401,99 (entsprechend € 630.895,58 ersatzfähig. Sie liegt damit unter der Haftungshöchstgrenze nach § 431 I HGB.

Auch wenn es demnach auf die Frage des Wegfalls der Haftungsbeschränkung nach § 435 HGB nicht stellt, wird auf folgendes hingewiesen: Nach den nach der mündlichen Verhandlung eingegangenen Schriftsätzen wird die (durch den Schriftsatz der Nebenintervenientin vom 20.3.06 (Seite 4, Bl. 47 der Akte) genährte Einschätzung, der Tieflader sei auf eine unebene Seitenstraße eingebogen, vermutlich nicht aufrecht erhalten werden können. Wenn die von der Klägerin eingereichten Fotos den Zustand der Straße zum Schadenszeitpunkt richtig wiedergeben, war die Straße an der Unfallstelle nicht uneben. Die neuen Fotos weisen aber auf einen anderen Schadenshergang hin. Der Transformator kam nämlich nur ca. 2 Meter von der linken Straßenecke zu liegen und ist rechts vom Tieflader gefallen. Zu dieser Endposition konnte er vermutlich nur gelangen, wenn die linken Räder des Tiefladers über den ca. 15 cm hohen Kantstein gefahren sind, wenn also – wie die Nebenvenenientin es selbst für möglich hält - die Ecke geschnitten wurde. Wenn berücksichtigt wird, dass die Klägerin unwidersprochen behauptet hat, dass bereits das Beladen des Fahrzeugs wegen des schiefen Untergrundes nicht mittig erfolgte, das Fahrzeug im Unterschied zu dem beim ersten Transport benutzten Tieflader keine lenkbaren Hinterachsen hatte und es genau an dieser Ecke bereits Probleme mit dem vorhergehenden Transport gegeben hatte,

liegen deutliche Anhaltspunkte dafür vor, dass der Fahrer leichtfertig gehandelt und sich der Möglichkeit des Unfalls verschlossen hat. Er ist so eng um die Kurve gefahren, dass er den durch Schnee verdeckten Kantstein übersehen hat, obwohl dessen Existenz und Höhe nach den Örtlichkeiten sehr nahe lag.

6. Unbegründet ist die Klage, soweit die Klägerin einen Betrag von US$ 116.730,94 (entsprechend € 88.155,21) begehrt. Hierbei soll es sich um einen Betrag für entgangenen „imaginären" Gewinn handeln, den die Klägerin und ihre Mitversicherer nach ihrer Police ihrem Versicherungsnehmer über die Schadenssumme hinaus schulden; er soll nach der Darstellung der Klägerin „den Gewinn ausgleichen, den der Käufer einer Sache infolge des Verlustes nicht erzielen kann". Diese vertragliche Verpflichtung der Klägerin gegenüber ihrer Versicherungsnehmerin mag bestehen. Indessen handelt es sich nicht um eine adäquate Folge des Verstoßes des Transportvertrages durch die Beklagte, sondern um eine aus ganz anderen Gründen versprochene Leistung, die nicht ersatzfähig ist. Betroffen ist auch nicht der Käufer oder Empfänger eines Transportgutes, sondern der Absender und dieser wird dem Käufer diesen Ersatz nicht gezahlt haben, weil der Transformator erneut geliefert wurde.

7. Zu Recht begehrt die Klägerin allerdings noch eigene Kosten der Schadensfeststellung, nämlich die an die Gutachterin Expertisenbüro Binnenduk – Bree BV gezahlten beiden Rechnungen K28/28a (€ 11.339,15 für 22,5 Stunden für die Zeit bis 27.12.04 und Reisekosten) und K6/K6a (€ 9.722,30 für 32 Stunden für die Zeit bis 18.5.05 und Kosten des Lloyds Agenten in Anchorage). Diese Kosten hat sie selbst aufgewendet zur Vorbereitung dieses Rechtsstreits.

Diese Kosten waren notwendig. Die Klägerin musste gewärtigen, dass sie den Prozess gegen den oder die Schadensverursacher nur dann mit Erfolg führen konnte, wenn sie selbst den Unfallhergang und die Unfallursache wenigstens substantiiert behaupten konnte. Das Verhalten der Beklagten in diesem Rechtsstreit zeigt die Richtigkeit der Prognose: nicht nur, dass sich der unmittelbare Verursacher, der Fahrer Crowson, der Schadensfeststellung vor Ort durch Flucht entzogen hatte, die Beklagte und die Nebenintervenientin haben auch den Schadenshergang in allen Punkten vehement bestritten und zur eigenen Aufklärung überhaupt nichts

beigetragen. Erst durch das investigative Vorgehen und das Gutachten des Expertisenbüros (K19) wurde die Klägerin instand gesetzt, konkret vorzutragen.

Die Rechtsgrundlage mag, wie die Beklagte und die Nebenintervenientin vermutlich zu Recht anmerken, nicht in § 91 ZPO gesehen werden können, weil hierin zwar die Verpflichtung enthalten ist, die zweckentsprechenden Kosten der Rechtsverfolgung zu tragen, aber die Vorschrift keine eigene materielle Schadensersatznorm darstellt Zöller-Herget, ZPO, 25. Auflage, vor § 91 Rdn. 11). Der Ersatzanspruch findet aber seine Grundlage ebenfalls in § 430 HGB. Auch diese Kosten gehören zur Schadensfeststellung, die nach den obigen Ausführungen ersatzfähig sind (vgl. oben 5d). Sie sind zwar nicht der Fa. SGB entstanden, weil sie für diese Versicherungsnehmerin nicht notwendig waren, denn die Klägerin musste ihr bereits aufgrund der vorläufigen Feststellungen durch die unter 5d genannten Gutachten Ersatz leisten. Sie sind aber der Klägerin entstanden. Insofern liegt der Fall wie bei einer Drittschadensliquidation (Palandt-Heinrichs, BGB, 65. Auflage, vor § 249 Rdn. 113f), wobei hier der Fall hier nur deshalb ungewöhnlich liegt, weil der ursprünglich anspruchslose geschädigte Dritte klagt und nicht der schadenslose ursprünglich Berechtigte. Das beruht aber darauf, dass der Anspruch nach § 67 VVG bzw. Art 284 des niederländischen HGB auf die Klägerin (bzw. die durch sie vertretenen Mitversicherer) übergegangen ist und kann sich nicht zu Gunsten der Beklagten auswirken.

Zur Höhe der Kosten haben weder die Beklagte noch die Nebenintervenientin konkrete Einwändungen erhoben. Sie haben sich allein auf den Standpunkt gestellt, die Frage der Erstattungsfähigkeit könne und müsse ausschließlich im Kostenfestsetzungsverfahren erfolgen. Dem folgt das Gericht nicht. Das Kostenfestsetzungsverfahren ist ein summarisches Verfahren und nicht immer geeignet, materielle Ansprüche zu untersuchen. Insofern besteht jedenfalls dann, wenn bereits im Rechtsstreit Streit über die Ersatzfähigkeit entsteht, ein Rechtsschutzinteresse, die Kosten neben der Hauptforderung zum Gegenstand des Rechtsstreits selbst zu machen (Zöller, a.a.O. Rdn. 12).

8. Der Klägerin beansprucht ferner € 18.890,80 wegen einer Materialpreiserhöhung. Sie hat dazu vorgebracht, die Fa. SGB habe zur Erfüllung ihrer Lieferverpflichtung

14

hinsichtlich des verunglückten Transformators diesen erneut herstellen und an ihre Abnehmerin ausliefern müssen, und zwar zu demselben vereinbarten Preis. Die Herstellung des Ersatztransformators habe – vornehmlich wegen einer Erhöhung des Rohkupferpreises – entsprechend einer Aufstellung der Fa. SGB (K10) € 18.890,80 mehr gekostet. Diesen Betrag habe die Klägerin zwar, weil die Versicherungsbedingungen dies nicht vorsähen, nicht an SGB gezahlt, mache ihn aber aus abgetretenem Recht geltend.

Dieser Anspruch kann ihr nicht zuerkannt werden. Er wäre zwar nach § 435 HGB ersatzfähig, wenn die Beklagte und/oder ihre Erfüllungsgehilfen den Schadensfall vorsätzlich oder grob fahrlässig herbeigeführt hätten; dies kann aber, weil die nach dem Schluss der mündlichen Verhandlung eingegangenen Schriftsätze nicht verwertet werden konnten, noch nicht festgestellt werden.

Die Klägerin kann den Betrag, da weder sie noch die Mitversicherer diesen Betrag erstattet haben, nicht aus dem gesetzlichen Forderungsübergang (§ 67 VVG oder Art 284 niederl. HGB) geltend machen, sondern nur, wenn ihr der Anspruch wirksam abgetreten wurde. Die Wirksamkeit der Abtretung ist, weil die Abtretung in Deutschland vorgenommen wurde, nach deutschem Recht zu beurteilen.

Das Gericht folgt insoweit der Ansicht der Beklagten, wonach die Abtretung wegen Verstoßes gegen das RBerG nach § 134 BGB unwirksam ist. Nach Art 1 § 1 RBerG ist die Einziehung fremder oder zu Einziehungszwecken abgetretener Forderungen grundsätzlich erlaubnispflichtig und die Klägerin hat nach einem entsprechenden Bestreiten der Beklagten eine solche Erlaubnis weder behauptet noch belegt. Es handelt sich hier auch nicht um die Geltendmachung des zwischen dem Versicherer und dem Versicherungsnehmer vereinbarten Selbstbehalts durch den Versicherer, bei welchem die oberlandesgerichtliche Rechtsprechung inzwischen vornehmlich aus Praktikabilitätserwägungen keinen Verstoß gegen das RBerG mehr annimmt (OLG Karlsruhe, NJW-RR 2005, 909; OLG Köln, VersR 2004, 1456; OLG Stuttgart, NJOZ 2004, 3401, zusammenfassend hierzu Sabel, NVZ 2006, 6f.). Hier handelt es sich vielmehr um eine nicht zum versicherten Schaden gehörende, sondern um eine auch dem Grunde nach nicht versicherte Schadensposition, deren Geltendmachung über eine bloß annexe Dienstleistung hinausgeht.

9. Im Ergebnis hat daher die Klage in der Hauptsache in Höhe von € 652.017,03 Erfolg und muss die weitergehende Klage abgewiesen werden. Der Zinsanspruch der Klägerin folgt aus den §§ 291, 288 BGB.

10. Die Kostenentscheidung beruht auf den § 92, 101 ZPO. Die Entscheidung über die vorläufige Vollstreckbarkeit ergibt sich aus § 709 ZPO.

Müller-Fritsch          Dr. Möhlmann          Saecker

*Ausgefertigt*

Pfeiffer
Justizangestellte

Landgericht Hamburg  
417 O 230/05 Delta Vers. ./. Gericke  
Anlage zum Urteil vom 27.9.06

| Bezeichnung | Anl | USD | Umrech | Klägerin € | USD | Umrech | Landgericht € |
|---|---|---|---|---|---|---|---|
| **Schadensberechnung** | | | | | | | |
| Rechnungswert | | 840.972,00 | 0,7552 | 635.102,05 | 839.424,00 | 0,7552 | 633.933,00 |
| nicht gebrauchte Teile | | -40.752,67 | 0,7552 | -30.776,42 | -40.752,67 | 0,7552 | -30.776,42 |
| LagerK verk Teile | | 600,00 | 0,7552 | 453,12 | 600,00 | 0,7552 | 453,12 |
| Kosten Rücktransp | 9e | 10.040,00 | 0,7552 | 7.582,21 | 10.040,00 | 0,7552 | 7.582,21 |
| RepK Schockrekorder | 9f | 632,52 | 0,7552 | 477,68 | 632,52 | 0,7552 | 477,68 |
| nicht ausgef. Arbeiten | | -5.160,00 | 0,7552 | -3.896,83 | -5.160,00 | 0,7552 | -3.896,83 |
| Verkaufserlöse | | -16.880,00 | 0,7552 | -12.747,78 | -16.880,00 | 0,7552 | -12.747,78 |
| Zwischensumme | | 789.451,85 | | 596.194,04 | 787.903,85 | | 595.024,99 |
| Bergg ReiniggKosten | 9d | 39.400,00 | 0,7552 | 29.754,88 | 39.400,00 | 0,7552 | 29.754,88 |
| SV Suman ET&S Inc | 9h | 3.248,14 | 0,7552 | 2.453,00 | 3.248,14 | 0,7552 | 2.453,00 |
| GutachterK SGB | 9b | 4.850,00 | 0,7552 | 3.662,72 | 4.850,00 | 0,7552 | 3.662,72 |
| Zwischensumme | | 47.498,14 | | 35.870,60 | 47.498,14 | | 35.870,60 |
| Zwischensumme | | 836.949,99 | | 632.064,63 | 835.401,99 | | 630.895,58 |
| Steuerschaden | | 116.730,94 | 0,7552 | 88.155,21 | 116.730,94 | 0,7552 | 0,00 |
| Zwischensumme | | 953.680,93 | | 720.219,84 | 952.132,93 | | 630.895,58 |
| GutachtenK | | | | 11.399,15 | | | 11.399,15 |
| GutachtenK | | | | 9.722,30 | | | 9.722,30 |
| Preissteig b Neubau | 10 | | | 18.890,80 | | | |
| | | | | 40.012,25 | | | 21.121,45 |
| Klagesumme/Urteilssumme | | | | 760.232,09 | | | 652.017,03 |
| | | | | | | | |
| **Berechnung** | | | | | | | |
| Höchstentschädigung | | lbs | | kg | Reinheit | Faktor | |
| | | 210.300,00 | 2,2046 | 95.390,59 | 1,10000 | 8,3300 | 874.063,97 |
| | | 210.300,00 | 2,2046 | 95.390,59 | 1,16132 | 8,3300 | 922.789,06 |
| | | 234.000,00 | 2,2046 | 106.140,74 | 1,16132 | 8,3300 | 1.026.783,83 |
| **Kostenquote** | | | | | Erfolg | | 652.017,03 |
| | | | | | Begehr | | 760.232,09 |
| | | | | | Erfolgsquote | | 85,77% |