Page 10

1  three times a year?
2      A. Probably four to six times a year, big
3  transformers.
4      Q. And does that often involve, from your side,
5  moving the transformer either from a truck platform or
6  a truck trailer to a job site or from a railroad car to
7  a truck?
8      A. Typically it's from a railroad car to a
9  truck to the job site and then to the foundation.
10     Q. And again, would you have been doing these
11 jobs as part of Bragg Crane & Rigging?
12     A. Yes. Actually, Bragg Crane & Rigging
13 generally takes the lead in doing a lot of these jobs.
14 I think it depends on who the -- you know, whose
15 customer it is or who the call comes in to, because I
16 know Justin was very active in transformer projects.
17     Q. Does it also matter where the location of
18 the move is?
19     A. As to what?
20     Q. As to whether Bragg Crane & Rigging is
21 involved.
22     A. I would say probably yes. We probably do
23 more local projects.
24     Q. By "local," would that be Southern
25 California?

Page 11

1      A. Yeah.
2      Q. Does Bragg Crane & Rigging have any
3  equipment outside the state of California?
4      A. I don't think so.
5      Q. Was this the first time you had to go on a
6  project outside the state of California?
7      A. No.
8      Q. Maybe it would help to get --
9          Roy, why don't we take a short break and see
10 how she's doing with the copying. I think it will go
11 quicker if we had that file.
12         (Recess taken.)
13     Q. BY MR. JOHNSON: Mr. Martin, where is your
14 office located.
15     A. Right here.
16     Q. "Here" being --
17     A. In this building.
18     Q. Which, I guess, is Paramount? Or is this
19 Long Beach?
20     A. This is Long Beach.
21     Q. We're having marked your original file which
22 you brought with you here today, I take it?
23     A. Yes.
24     Q. And was that file kept in your office here?
25     A. Yes.

Page 12

1      Q. Have you been asked to provide that file to
2  anyone prior to today?
3      A. No.
4      Q. Had you received any file documents or file
5  from Justin Gilmet as part of this move, that is, a
6  file?
7      A. No.
8      Q. The file that is your file, are those
9  documents that you obtained as a result of this
10 project?
11     A. Yes.
12     Q. And I take it you kept it in your desk by
13 project number?
14     A. Yes.
15     Q. How was it labeled in your desk?
16     A. (Witness displaying file.)
17     Q. You're showing me a file named "Bachmann"?
18     A. "UTC Bachmann, AK Transformers."
19     Q. Are you aware of any other files maintained
20 in the company regarding this project?
21     A. No.
22     MR. JOHNSON: All right. Let's take another
23 break.
24     (Recess taken.)
25     Q. BY MR. JOHNSON: Mr. Martin, in your office

Page 13

1  do you have a computer as part of your work assignment
2  here?
3      A. Yes.
4      Q. Have you had that same computer since 2004?
5      A. That I'm not sure.
6      Q. Would there be any documents or electronic
7  things relative to this file?
8      A. No.
9      Q. If you have e-mail messages, are those
10 e-mail messages printed out and put in the file or are
11 they stored electronically?
12     A. Pertaining to this job, I don't think I have
13 any e-mail correspondence. I got a hard copy of an
14 e-mail from Justin to -- actually, it's to Connie
15 Rains, but it says, "Bill, we're working," blah, blah,
16 blah, so I knew it was to Bill Rains. They're husband
17 and wife.
18     Q. But as far as you remember, you did not
19 receive any e-mail messages regarding this matter?
20     A. No.
21     Q. And also -- were there any e-mail messages
22 sent not only for the project, the original planned
23 project, but there was also the salvage operation and
24 then now this litigation. Were there any e-mail
25 messages concerning any of those?

Page 14

1  A. None that I know of.
2  Q. Are your e-mail messages stored or backed up
3  electronically on your system?
4  A. I imagine.
5  MR. JOHNSON: Take another break.
6  (Recess taken.)
7  Q. BY MR. JOHNSON: Mr. Martin, what you have
8  in front of you is your original file that we discussed
9  that you had kept in your desk as part of this project;
10  is that correct?
11  A. Correct.
12  Q. And what we have copied in front of you and
13  what's been marked as Exhibit 36 is -- will be -- it is
14  now most of that file, but a copy of that file, and I
15  want to keep the original file here so that as we go
16  through, we might want to compare the pages to make
17  sure that everything got copied correctly, and if
18  there's any notes on the back that weren't copied, we
19  can identify those. So we might look at both your
20  original file and the copy.
21  (Defendants' Exhibit 36 was marked for
22  identification by the Reporter.)
23  Q. BY MR. JOHNSON: Theoretically they're in
24  order, so the first page of Exhibit 36, which is
25  Bragg 34 -- and when I refer to Bragg 34, it's the

Page 15

1  number that has been added to identify each page at the
2  bottom.
3  So at Bragg 34, is this the e-mail message
4  you mentioned that you received from Connie Rains?
5  A. Yes.
6  Q. And the date of that e-mail message is
7  November 24, '04; is that correct?
8  A. That's correct.
9  Q. And, Mr. Martin, just for your information,
10  it helps to answer orally for her in a yes or a no
11  rather than huh-uh or uh-huh.
12  A. Sorry.
13  Q. It makes the reading a lot easier. We may
14  understand. We're not trying to cause you any
15  problems.
16  But how did you receive this document?
17  Did you --
18  A. I think by hand.
19  Q. From whom? Do you remember?
20  A. That I don't remember. I just don't
21  remember.
22  Q. It would have been somebody in Bragg Crane &
23  Rigging who would have given it to you?
24  A. No. Probably more likely someone from Heavy
25  Transport.

Page 16

1  Q. And in this building where we're in in
2  Long Beach it's the headquarters for Bragg Crane &
3  Rigging and a number of the Bragg Companies; is that
4  correct?
5  A. Yes.
6  Q. Is it also the headquarters for Heavy
7  Transport?
8  A. Yes.
9  Q. So someone such as Mr. Chris Bragg or
10  Mr. Rains could have walked down the hall and handed
11  this to you?
12  A. Yes.
13  Q. Now, although it's addressed to Connie from
14  Justin Gilmet, it says -- it starts out by saying
15  "Bill"; is that correct?
16  A. Yes.
17  Q. And "Bill" would have been Bill Rains?
18  A. Yes.
19  Q. Okay. And this -- do you remember whether
20  any other documents were provided to you?
21  A. I think so. Unfortunately, I don't think
22  this is in any chronological order anymore.
23  Q. Why don't you take a minute and go through
24  it and see if you recognize anything in it that was
25  given to you prior to you going to Alaska.

Page 17

1  A. I think -- starting with Bragg 95 through
2  Bragg 100, and I think that's also the same document
3  that had the blue sticker with some numbers on the
4  back. I think that was also something I was given.
5  Q. Okay. So 95, which I think -- does the
6  first thing at the top say it's page 1, "Justin Gilmet,
7  Bragg Crane"?
8  A. Yes. It looks to be from the railroad.
9  Q. Some form of bill of lading or reference?
10  A. Yes.
11  Q. And that goes on for several pages?
12  A. Looks like 95 through 100.
13  Q. Is there another copy?
14  A. There's a duplicate of that e-mail, one that
15  I scribbled on.
16  Q. And that's Bragg what?
17  A. That's Bragg 101.
18  Q. Which is -- this is that same e-mail that
19  was in the front first page from --
20  A. Yes, it's the exact same e-mail.
21  Q. And the handwriting on that is your
22  handwriting?
23  A. Yes.
24  Q. And it appears you've underlined "North Star
25  Stevedoring," you've underlined "Northstar Trucking,"

Exhibit A-5 (Pages 14 to 17)
Page 2 of 2