A103F07
JUSTIN GILMET    AUGUST 21, 2007

UNITED STATES DISTRICT COURT

FOR THE STATE OF ALASKA AT ANCHORAGE

J.H. BACHMANN GmbH and UTC )
BACHMANN, INC., )
 )
    Plaintiffs )
 )
VS. )  Case No. 3:06 CBV 00145
 )  (TMB) Consolidated with
BRAGG INVESTMENT COMPANY, )  Case No. 06-CV-274
INC. Successor-in-interest )
by Merger to HEAVY )
TRANSPORT, INC., NORTHSTAR )
TRUCKING, INC., NORTH STAR )
TERMINAL AND STEVEDORE )
COMPANY, LLC, NORTH STAR )
TERMINAL AND STEVEDORE )
COMPANY, LLC OF DELAWARE and )
SHANE D. CROWSON dba ALASKA )
HEAVY HAUL TRANSPORT, )
 )
    Defendants. )


DEPOSITION OF JUSTIN GILMET

LONG BEACH, CALIFORNIA

AUGUST 21, 2007


ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

REPORTED BY:   GRACE CHUNG, CSR NO. 6246, RMR, CLR
               Certified Realtime Reporter

FILE NO.: A103F07

Exhibit A
Page 1 of 6

Page 1

**Page 66**

1  A   In charge, no. I was in Fontana.
2  Q   Okay. But --
3  A   There was nobody else working for me, in
4  other words.
5  Q   How many people were at the Fontana office?
6  A   From Heavy Transport?
7  Q   Yes.
8  A   One.
9  Q   Just you?
10 A   Me.
11 Q   Was the Fontana office also a location where
12 Bragg Crane or other Bragg companies had personnel?
13 A   Yes.
14 Q   Is Heavy Transport, to your knowledge, a
15 separate corporation from Bragg?
16 A   I'm not part of the family or part of the
17 upper management at that time, so I don't know.
18 Q   In your mind, it's a distinct, discrete,
19 separate --
20 A   Well, it's part of the Bragg companies.
21 Q   All right. But you're not familiar with the
22 corporate structure of the Bragg companies?
23 A   No.
24 Q   You mentioned several times a file. You
25 would have put documents into the file. In your mind, is

**Page 67**

1  there a file that's specific to this project that you saw
2  that the documents you looked at and were involved with
3  eventually wound up in?
4  A   Yes.
5  Q   When was the last time you saw that file?
6  A   An estimated date?
7  Q   Your best estimate.
8  A   Probably July of '05, roughly.
9  Q   July of '05. Was there some event that
10 helped you to recall that date?
11 A   No.
12 Q   I mean, were you looking at the file for some
13 particular purpose?
14 A   Actually, the file was sitting on my desk,
15 and it always just stayed there.
16 Q   Sitting on it from the start of the job?
17 A   Yes.
18 Q   Do you know where that file is today?
19 A   No, I do not.
20 Q   Did you ever give it to somebody?
21 A   Not to my recollection, no.
22 Q   Did you -- where do you believe it was at the
23 time that you left the employment of Heavy Transport?
24 A   The same place where I left it.
25 Q   On a desk in Fontana?

**Page 68**

1  A   Correct.
2  Q   And was there a separate file that was kept
3  at Bragg's offices here in Long Beach, on this project?
4  A   Not to my knowledge.
5  Q   Now, did you communicate with Mr. Bragg,
6  Chris Bragg? Is that who you are talking about, Chris?
7  A   Correct.
8  Q   Did you communicate with him by e-mail?
9  A   Yes.
10 Q   Did you print off e-mail communications and
11 stick them in the file relating to the project?
12 A   If it was pertinent information, I would
13 have, yes.
14 Q   Okay. If it was information pertinent to the
15 project, your customary practice would have been to print
16 it and stick it in the file?
17 A   If it was an e-mail, not conveyed over the
18 phone, yes.
19 Q   And if it was information conveyed over the
20 phone that you thought was important, you would make
21 notes of it and stick those notes in the file?
22 A   Not necessarily so, no.
23 Q   "Not necessarily so, no"?
24 A   That's correct.
25 Q   Was there some method as to when you would

**Page 69**

1  put your notes in the file and when you would not?
2  A   No.
3  Q   Just sometimes you did and sometimes you
4  didn't?
5  A   Correct.
6  Q   Now, you mentioned talking with Mitch
7  Hatfield with Northstar Trucking and that you spoke to
8  him both before -- well, before the project up to shortly
9  before the accident?
10 A   Correct.
11 Q   You were communicating with Mitch by phone?
12 A   That's correct, yes.
13 Q   And by e-mail?
14 A   Yes.
15 Q   And you couldn't recall if you'd spoken to
16 him after the accident. Did I hear that right?
17 A   That is correct. I don't recall whether or
18 not I spoke with him after the accident.
19 Q   Did you speak with anyone else from Northstar
20 Trucking?
21 A   To my recollection, no.
22 Q   So Mitch is it? That's this person with whom
23 you had all your communications about this project with
24 Northstar Trucking?
25 A   As I recall, yes.

### Page 74

1 together and they would be doing the transportation for
2 us.
3    Q    Is that some reason that you didn't sign
4 Exhibit 5 and date it and return it to Northstar
5 Trucking?
6    A    Not that I recall, no.
7    Q    Have you done other moves similar to this
8 one?
9    A    Yes.
10   Q    Hundreds?
11   A    Probably so, yes.
12   Q    Is it your customary practice to arrange for
13 transportation with a trucking firm and not have an
14 executed agreement with it?
15   A    That is industrywide, yes.
16   Q    Okay. So this was -- the fact that there
17 isn't any written agreement between Heavy Transport on
18 the one hand and Northstar Trucking on the other isn't
19 outside of the normal way you do business?
20        MR. LIBBEY: Object to the question and form,
21 calling for a legal conclusion.
22 BY MR. FALCONER:
23   Q    You can answer.
24   A    Could you repeat it one more time, please?
25        MR. FALCONER: Could you read it back,

### Page 75

1 please?
2        (Reporter read back the requested text.)
3    A    Correct. Although it's getting worse today.
4 BY MR. FALCONER:
5    Q    "Getting worse," meaning it's even less
6 documented?
7    A    No. It's getting even more documented. It's
8 taking longer and longer to even get any work done.
9    Q    And when you said it's getting worse, in your
10 view, having all kinds of documentation reflecting the
11 agreements between parties interferes with getting the
12 project done efficiently?
13   A    Having more documents, period.
14   Q    Is it bad?
15   A    No, it's good.
16   Q    But it delays getting the job done?
17   A    Obviously, yes.
18   Q    What about Exhibit 3? That's your agreement.
19 Is this what you consider to be the agreement between
20 Heavy Transport and UTC/J.H. Bachmann?
21   A    That is correct.
22   Q    Do you consider Heavy Transport's agreement
23 to be with both J.H. and UTC or one or the other?
24        MR. LONGACRE: Objection.
25 BY MR. FALCONER:

### Page 76

1    Q    Well, I'm just trying to decide who it was
2 that you regard the contractual relationship to be with,
3 of the two Bachmann entities.
4        MR. LONGACRE: Continue with the objection.
5    A    Both.
6 BY MR. FALCONER:
7    Q    Okay. In your mind, they are one and the
8 same?
9    A    Yes, because they had -- as you understood
10 it, UTC Bachmann had joined together with Bachmann
11 representing European and UTC representing the U.S.A.
12   Q    Now, the language that appears below the word
13 "Attachment" on the first page of Exhibit 3 through page
14 2 of Exhibit 3, just above the signature lines, that all
15 appears to be fairly -- what I will call standard
16 verbiage. Is that a fair description of it?
17   A    To me, it was, yes, since I brought it up.
18   Q    And was this typical of the terms and
19 conditions you would add to your proposals to perform
20 these types of services?
21   A    Yes.
22   Q    Did you consider important to have the
23 agreement signed by the party you are entering into the
24 agreement with?
25   A    Yes.

### Page 77

1    Q    And are you telling me that until and unless
2 that other party sign the agreement, you wouldn't
3 consider there to be a contract in place?
4    A    I don't know whether I would consider it a
5 legal contract, but that was our agreement. And it
6 needed to be a -- they needed to verify that they
7 understand -- most parts of this is for the rail itself,
8 because we can get stuck -- Heavy Transport could have
9 been stuck with additional charges, such as detention
10 charges for a railcar.
11       If they don't agree to that, and we try to
12 charge them back, which the demurrage or detention charge
13 can go to thousands of dollars, they could say that they
14 never agreed to pay those charges. So that's why we
15 always had that portion signed.
16   Q    Okay. So it was important to you that the
17 agreement be signed?
18   A    That's correct.
19   Q    And if it wasn't signed, you wouldn't
20 consider Heavy Transport obligated to perform the
21 agreement, would you?
22   A    Correct.
23   Q    Were there any kinds of standard terms and
24 conditions that you would typically put into agreements
25 that you entered into with truckers who would be

**Page 86**

1  I even called him at this point.
2  Q  Okay. And what about Crowson? That's
3  Exhibit 10. Was there anything about that that was, from
4  your view, inadequate?
5  A  Not to my knowledge at that time, no.
6  Q  Kirk Martin. Is he still employed by the
7  company?
8  A  I don't work for the company anymore, so I
9  don't know.
10  Q  Did you think he was a good choice to send to
11  Alaska to represent Heavy Transport's interests on the
12  project?
13  A  I guess I did not have any feeling one way or
14  the other.
15  Q  It was a matter of indifference whether it
16  was he or somebody else that went --
17      MR. LIBBEY: I object. That was not his
18  answer.
19  BY MR. FALCONER:
20  Q  Was there anybody else that you preferred the
21  company send?
22  A  No.
23  Q  You didn't make any suggestions about who
24  should be sent?
25  A  Not that I recall, no.

**Page 87**

1  Q  You said you were a head salesman? That was
2  your title?
3  A  Sales manager.
4  Q  Sales manager. Where you also -- did your
5  title include project coordinator?
6  A  I guess I could have been at one time. I
7  mean, yeah, some jobs, I would take care of the rail on
8  or the offloading and setting, yeah. Sometimes I could
9  be a project coordinator.
10  Q  Did you consider yourself the project
11  coordinator for this transformer move?
12  A  Yes.
13  Q  Excuse me for the pause, but I think it will
14  be quicker if I kind of go through it, because a lot of
15  what I was going to ask was actually covered before.
16      After the accident, did Shane Crowson at one
17  point send you invoices for his services?
18  A  I don't remember if he did or not.
19  Q  Do you remember -- do you recognize the name
20  of the gentleman, Kirk Nielsen? Did I get that right,
21  Kirk Nielsen? Does that ring a bell?
22  A  Vaguely, and only because of Kirk Martin. So
23  I don't know. Vaguely, though. I mean the Nielsen, no.
24  Q  Do you know who drove the truck that moves
25  the transformer that didn't get damaged?

**Page 88**

1  A  No.
2  Q  Didn't you get invoices from both Alaska
3  Heavy Haul and another trucker for the transformer moves,
4  and communicate to both that they needed to redirect
5  their invoices to Northstar Trucking?
6  A  If I would have received them, although I
7  think I said that I didn't receive one from Alaska Heavy
8  Haul, if I did receive them, I would have directed them
9  to do that, since Northstar was the one that I was
10  working with. So that's what would have been done.
11  Q  Okay. So as you sit here now, you have no
12  recollection of having received invoices --
13  A  No.
14  Q  -- directly from either of the two truckers
15  that moved the transformers?
16  A  That is correct.
17  Q  Now, for the transformer that got
18  successfully delivered to South Anchorage, was there any
19  paperwork that Heavy Transport had Chugach Electric sign
20  acknowledge receipt?
21  A  That is not something that's requested
22  normally. But if they did, yes, we would have complied
23  with their request.
24  Q  When you say that wouldn't be their request,
25  whose request?

**Page 89**

1  A  Either from our customer, from Chugach
2  Electric.
3  Q  Have you ever seen a document signed by
4  Chugach Electric relative to the transformer that was
5  delivered?
6  A  No.
7  Q  Would you consider NTI to be a sub-hauler to
8  you? And "NTI" mean Northstar Trucking.
9  A  I'm not a legal person, so I really don't
10  know. All I know is that they were working for us.
11  Q  But what's -- a sub-hauler is a term that you
12  use, isn't it?
13  A  Sub-hauler, yes.
14  Q  What do you mean when you refer to a
15  sub-hauler?
16  A  Normally, that's somebody that has a contract
17  issued to them.
18  Q  With Heavy Transport?
19  A  Correct, as I understand it. Again, I'm not
20  a legal person, so it would be like, you know -- I won't
21  go into that.
22  Q  No. I just wondered if you would refer to
23  Northstar Trucking as a sub-hauler, or would Shane
24  Crowson be a sub-hauler?
25      MR. MATTHEWS: Objection; form.

**Page 126**

1  A  Transportation, yes.
2  Q  Okay. That was your understanding back --
3  after of accident of February 15th, when you were writing
4  to Mitch; correct?
5  A  Well, that was my understanding at the time
6  that we made the agreement for them to do the
7  transportation and after, yes.
8  Q  And your understanding has never changed at
9  any time?
10 A  That is correct.
11    MR. WILHELM: Okay. Let's mark this as
12 Exhibit 17.
13    (Deposition Exhibit 17 was marked for
14    identification by the reporter and is
15    attached herewith.)
16 BY MR. WILHELM:
17 Q  If you would take a brief look at Exhibit 17.
18 A  Okay.
19 Q  Exhibit 17, is that a collection of e-mails,
20 either from you or to you, regarding this project? Is
21 that correct?
22 A  That's what they state, yes.
23 Q  And as you sit here today, do these all
24 appear to be genuine e-mails that you were involved in?
25 A  It appears that way, yes.

**Page 127**

1  Q  Okay. As this project was going on, you had
2  frequent e-mail correspondence with other people;
3  correct?
4  A  Yes.
5  Q  You were in correspondence with Martin Stitz
6  at UTC Bachmann; correct?
7  A  Correct.
8  Q  And there is a Liane Rudlof. Who is Liane
9  Rudlof?
10 A  She works with J.H. Bachmann.
11 Q  In Germany?
12 A  That's what it says on here, yes.
13 Q  Do you know who she is, other than from
14 reviewing this e-mail?
15 A  Yes, I do.
16 Q  Okay. And she's somebody you would have also
17 communicated with regarding the status of this project;
18 correct?
19 A  Correct.
20 Q  Anybody else that you recall you would have
21 -- there's a Juergen Schubert who is on some of these
22 e-mails. Would you have corresponded with Juergen?
23 A  No.
24 Q  Who are you reporting -- this is in
25 November 2004. Who are you reporting to, primarily?

**Page 128**

1  A  Well, are you talking about to them or to UTC
2  or Bragg or to Heavy Transport?
3  Q  To either with respect to UTC Bachmann or UTC
4  overseas?
5  A  It would have been to --
6  Q  Or to J.H. Bachmann.
7  A  The communication goes back and forth.
8  Q  Right. So your job is to keep track of
9  what's going on with the project; right?
10 A  Correct.
11 Q  And you've talked to people about the
12 schedules, to coordinate the schedules; correct?
13 A  Correct.
14 Q  And this is just a smattering, but,
15 certainly, you would have been e-mailing to people on a
16 regular basis with respect to this project as problems
17 arose or issues arose; correct?
18 A  Correct.
19 Q  Okay. Now, you would also have been --
20 you've also had e-mail contact with either anybody at
21 North Star Terminal?
22 A  I believe the only person I had any contact
23 with there, although I can't say exactly, was Steve Post.
24 Q  Okay. And with respect to the trucking of
25 the transformers, the only downstream from you, the only

**Page 129**

1  person that you had contact with, was our friend at
2  Northstar Trucking; correct?
3     MR. LIBBEY: Mitch?
4     MR. WILHELM: Hitch Hatfield.
5  A  That I recall, yes.
6     MR. WILHELM: Let's mark this as the next
7  exhibit.
8     (Deposition Exhibit 18 was marked for
9     identification by the reporter and is
10    attached herewith.)
11 BY MR. WILHELM:
12 Q  On Exhibit 18, I want you to look primarily
13 to the second page. And you see the letter addressed
14 from Liane to Martin and yourself?
15 A  Yes.
16 Q  Do you recall receiving that?
17 A  No, I don't recall receiving it, but --
18 Q  Okay. At this point, you were asked to
19 confirm who the contractors were with respect to the
20 transform moving?
21 A  Yes, I was.
22 Q  And you were asked to let North Star have a
23 purchase order to avoid further distrust from Chugach
24 Electric. Do you see that?
25 A  I see that.

A103F07
## JUSTIN GILMET     AUGUST 21, 2007

```
 1   STATE OF CALIFORNIA   )
 2   COUNTY OF LOS ANGELES ) ss.
 3
 4        I, JUSTIN GILMET, hereby certify under
 5   penalty of perjury under the laws of the State of
 6   California that the foregoing is true and correct.
 7        Executed this_____day of
 8   _____, 2007, at_____, California.
 9
10        _____
11        JUSTIN GILMET
12
13
...
25
                              Page 218
```

```
 1   STATE OF CALIFORNIA   )
 2   COUNTY OF LOS ANGELES ) ss.
 3
 4
 5        I, GRACE CHUNG, C.S.R. No. 6246, in and for
 6   the State of California, do hereby certify:
 7        That, prior to being examined, the witness
 8   named in the foregoing deposition was by me duly sworn to
 9   testify to the truth, the whole truth and nothing but the
10   truth;
11        That said deposition was taken by me in
12   shorthand at the time and place therein named, and
13   thereafter reduced to typewriting under my direction; and
14   the same is a true, correct, and complete transcript of
15   said proceedings.
16        I further certify that I am not interested in
17   the event of the action.
18        Witness my hand this 6th day of September,
19   2007.
20        _____
          GRACE CHUNG, CSR No. 6246
21        RMR, CRR, CLR
22
23
24
25
                              Page 219
```

56 (Pages 218 to 219)

Exhibit A Page 6 of 6