Page 1

UNITED STATES DISTRICT COURT

FOR THE STATE OF ALASKA AT ANCHORAGE

| | |
|---|---|
| J.H. BACHMANN GmbH and UTC BACHMANN, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> BRAGG INVESTMENT COMPANY, INC. Successor-interest by Merger to HEAVY TRANSPORT, INC., NORTHSTAR TRUCKING, IN.C, NORTH STAR TERMINAL AND STEVEDORE COMPANY, LLC NORTH STAR TERMINAL AND STEVEDORE COMPANY, LLC OF DELAWARE AND SHANE D. CROWSON dba ALASKA HEAVY HAUL TRANSPORT, <br><br> Defendants. | ) ) ) ) ) ) ) Case No. 3:06 CBV 00145 ) (TMB) Consolidated with ) Case No. 06-CV-274 ) ) ) ) ) ) ) ) ) ) ) ) |

DEPOSITION OF KIRK MARTIN

WEDNESDAY, AUGUST 22, 2007

LONG BEACH, CALIFORNIA


ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376

www.depo.com

REPORTED BY:  JEANINE CURCIONE
              CSR NO. 10223, RPR
FILE NO.: A10713B

Exhibit C
Page 1 of 5

Page 22

1  MR. JOHNSON: What's the number at the bottom?
2  62. Yes.
3  Q. Mr. Martin, looking at this e-mail, would
4  you have had this e-mail before you went to Alaska?
5  A. No, I don't think so.
6  Q. In any of the writing on this e-mail -- is
7  that any of your writing?
8  A. No.
9  Q. Do you recognize whose it is?
10  A. No.
11  Q. Let's go back to the very beginning and then
12  turn to -- start at the beginning. Right after the
13  first page, the first document -- or the next document,
14  Bragg 35, is a -- it's labeled "Supervisor's Incident
15  Report"; is that correct?
16  A. Yes.
17  Q. And is that a document that you prepared?
18  A. Yes.
19  Q. And the handwriting on that document is your
20  handwriting?
21  A. Yes.
22  Q. And the date -- it says the date of the
23  incident, 12-2-04, in Box No. 7.
24    Do you know when you filled out this report?
25  A. I believe the next day.

Page 23

1  Q. So the accident happened at about 2:00 in
2  the morning, and you would have filled it out on the
3  day of the accident or December 3, the day --
4  A. The next day.
5  Q. The next day.
6    Now, were you told to prepare this report by
7  anyone?
8  A. No, I don't think so.
9  Q. Did you prepare that report while you were
10  in Alaska?
11  A. Yes.
12  Q. And who would you have given that report to?
13  A. I believe we had a post-incident meeting
14  here in this office with Scott Bragg and Chris Bragg
15  and perhaps others, and I think -- I believe the
16  original was given to one of those people, if that's
17  what your question was.
18  Q. I take it you brought it back with you from
19  Alaska and gave it to them at the post-accident
20  meeting?
21  A. Yes.
22  Q. And you mentioned Scott and Chris Bragg?
23  A. Yes.
24  Q. Was Justin Gilmet also there?
25  A. Yes.

Page 24

1  Q. Anyone else?
2  A. Yes. I believe George Bragg and Maryann
3  Poole.
4  Q. Were there any notes of the meeting kept?
5  A. None that I know of.
6  Q. If you had kept notes, they would have been
7  in your file?
8  A. Yes.
9  Q. What was discussed at that meeting?
10  A. This incident report.
11  Q. And the next page after the incident
12  report -- first of all, going back to the second page,
13  Bragg 35, in the middle where you say -- where it's --
14  Box 15 says, "Describe how incident occurred," you
15  wrote, "See statement"; is that correct?
16  A. Yes.
17  Q. And then the next page -- I guess about four
18  pages -- appears to be various statements.
19  A. Yes.
20  Q. Were these statements that you either took
21  or had witnesses write up?
22  A. Yes. The first two pages is my handwriting
23  titled "Interview with Shane Crowson," and then --
24  MR. LONGACRE: There's two 37's. So let's make
25  that second 37, 37A.

Page 25

1  THE WITNESS: And then the next two pages are
2  titled "Witness Statements" --
3  MR. PFIFFNER: Which is A? Because in the way
4  they were provided to me, page 1 of 2 of the statement
5  was the second page, and 2 of 2 is the first page. So
6  they're in reverse order.
7  MR. JOHNSON: No.
8  MR. PFIFFNER: No, they're not actually.
9  MR. JOHNSON: Let's go off the record.
10    (Discussion off the record.)
11  Q. BY MR. JOHNSON: So after the incident, the
12  supervisor's incident report, the first two pages are
13  an interview you conducted of Mr. Crowson; correct?
14  A. Correct.
15  Q. And did you handwrite that yourself?
16  A. Yes, I did. I asked him to handwrite -- to
17  write one, and he said he didn't write very well and
18  said he would talk if I would write it out.
19  Q. After you had written it out, did you review
20  it with him to make sure he was in agreement with it?
21  A. Yes.
22  Q. And when -- this was done on what date?
23  A. It's dated 12-2.
24  Q. At the top it says 12-4 it seems to me.
25  A. Oh, yeah. He wasn't available. I want to

Exhibit C -7 (Pages 22 to 25)
Page 2 of 5

Page 90

1  Q. Did you observe the chaining or the securing
2  of the transformers to the lowboys?
3  A. Yes.
4  Q. Did that appear to be adequate to you?
5  A. Yes.
6  Q. Who did the chaining and securing?
7  A. The drivers.
8  Q. Is that normal?
9  A. Yes. They're responsible for chaining their
10 own load.
11 Q. You indicated in one of your incident
12 reports, I think, that Bill at Chugach signed your bill
13 of lading. Was there an actual bill of lading issued
14 by Heavy Transport that he signed?
15 A. I think I --
16 MR. PFIFFNER: Objection. Form.
17 THE WITNESS: I believe I took some blanks of my
18 own to have the customer sign.
19 Q. BY MR. JOHNSON: And by "bill of lading," is
20 it, like, a receipt document saying, "We've received
21 it"?
22 A. Yes.
23 Q. We've been through your file. Have you seen
24 that in your file?
25 A. No, I have not.

Page 91

1  Q. What would you normally do with that bill of
2  lading?
3  A. I think I turned it back in to Heavy
4  Transport.
5  MR. JOHNSON: I have no further questions. You
6  guys can fight about who goes next.
7  MR. FALCONER: Can we take a short break?
8  MR. JOHNSON: Sure.
9      (Recess taken.)
10
11     EXAMINATION
12 BY MR. FALCONER:
13 Q. Hi, Mr. Martin. My name is Bruce Falconer.
14 I represent Northstar Trucking, and I'm going to just
15 try to cover some of this but not duplicate any more
16 than I have to.
17    You don't recall, as you sit here now, who
18 directed you to go to Alaska on your first visit?
19 A. It was either Justin or Chris Bragg, I'm
20 quite sure. Or they might have went to my boss Scott
21 Bragg. It may have come that way. I don't remember.
22 Q. On the first page of Exhibit 36, which is
23 Bragg 34, that is the e-mail, it looks like, Justin
24 Gilmet is sending Bill up north.
25 A. Right.

Page 92

1  Q. Did you understand there was originally a
2  plan to send Bill Rains up north?
3  A. Yes.
4  Q. And you got substituted in his stead?
5  A. Yes.
6  Q. How did that come about? He just wasn't
7  available?
8  A. I don't know.
9  Q. You received this assignment on pretty short
10 notice?
11 A. Yes.
12 Q. Did you understand that your role was or
13 your marching orders were set forth in this e-mail,
14 which is Bragg 034?
15 A. Yes.
16 Q. So you were sent up there to protect our
17 interests --
18 A. Yes.
19 Q. -- referring to Heavy Transport and Bragg?
20 A. Yes.
21 Q. And you were instructed to take a bill of
22 lading with you and fill it out?
23 A. Yes.
24 Q. Is that normal?
25 A. Well, it depends.

Page 93

1  Q. For a job like this?
2  A. For a trucking job, yes.
3  Q. Okay.
4  A. I mean, you usually get a customer's
5  signature on something. In the trucking business it's
6  a bill of lading, and in our business it's other forms.
7  When I say "our business," meaning cranes are different
8  and rigging is different, but trucking uses a bill of
9  lading.
10 Q. And you described it as basically, what, a
11 receipt? To get the person I'm delivering something to
12 to acknowledge receipt of the item delivered?
13 A. Right.
14 Q. Do you recall if the bill of lading said
15 that Heavy Transport was delivering to Chugach Electric
16 one transformer, Serial No. XYZ, "Please sign here,
17 Chugach"?
18 A. I don't remember.
19 Q. And do you know where that bill of lading is
20 today?
21 A. No.
22 Q. Do you recall who you gave it to?
23 A. I would say Heavy Transport.
24 Q. Justin Gilmet?
25 A. I believe when we had our post-incident

Exhibit C    24 (Pages 90 to 93)
Page 3 of 5

Page 94

1  meeting, I gave it to either Justin or Chris Bragg.
2      Q. You referred to the post-incident meeting.
3  That was in this conference room?
4      A. Yes.
5      Q. And you described certain participants,
6  which were Scott Bragg, Chris Bragg, Justin Gilmet,
7  Maryann Poole, and I believe there was one other
8  gentleman.
9      A. George Bragg.
10     Q. George Bragg.
11        Anyone else?
12     A. I think that's it.
13     Q. Was a lawyer present?
14     A. No.
15     Q. Was this post-incident report -- excuse
16  me -- post-incident meeting, did that occur immediately
17  or sometime in the interval between when you first went
18  to Alaska and when you took your second trip?
19     A. Yes.
20     Q. What did you understand the instruction to
21  "protect our interest" to mean in terms of your going
22  to Alaska? What would you do to protect Heavy
23  Transport's interests?
24     A. Well, watch the performance of the work
25  being done.

Page 95

1      Q. Simply watch it, or help make sure that it
2  got done right?
3      A. I did try to make sure it got done right.
4      Q. Because as you understood it, there were two
5  subcontractors to Bragg, one doing the lifting and one
6  doing the trucking, but they were working for Bragg,
7  which in turn was working for Bachmann, and so you
8  wanted to make sure that those subcontractors performed
9  their work properly; correct?
10     A. Yes.
11     Q. Now, you had some witness statements
12  attached -- well, that I think were included with your
13  incident report; is that right?
14     A. Yes.
15     Q. And I'm at Bragg 37A and 38. Are you with
16  me?
17     A. Yes.
18     Q. There's a statement by Curt Nielsen, and
19  he's listed or describes himself. This is his writing?
20     A. Yes.
21     Q. This is the second entry on 37A. He was the
22  driver pulling the first transformer?
23     A. That's what it says.
24     Q. Did you understand -- have some
25  understanding as to who he was working for?

Page 96

1      A. I wasn't sure who he was working for.
2      Q. Did he indicate he was working for Shane
3  Crowson?
4      A. That's what I thought.
5      Q. And how did -- why did you think that? Is
6  it because of something Mr. Nielsen said? Something
7  Mr. Crowson said?
8      A. I got the impression all these people worked
9  for Shane.
10     Q. "All these people" meaning all of the
11  individuals who gave you witness statements on pages 37
12  and 37A?
13     A. Yeah.
14     Q. I'm sorry. Not 37 and 37A. 37A and 38?
15     A. Yes.
16     Q. Now, Curt Nielsen at the end of his
17  statement indicates, referring to the -- he says he
18  didn't witness the incident with the transformer,
19  "however, I did help load and secure both transformers
20  on trailers. Both were set with Bragg agent present
21  and at his direction."
22        Do you understand he's referring to you as
23  the Bragg agent present?
24     A. Yes.
25     Q. Is it correct that both transformers were

Page 97

1  set at your direction?
2      A. Well, I was part of all the discussions that
3  were going on.
4      Q. You talked about how a bunch of you were
5  standing around watching it happen and everybody got
6  their opinion and their point of view: "No, you should
7  move it forward a half inch. No, it should be one
8  inch." Is it that sort of thing?
9         Are the discussions centered on where
10 precisely to put the transformer on the trailer?
11     A. Yes.
12     Q. Who was in charge of deciding where
13 precisely it would be?
14     A. I told them that the center of gravity mark
15 on the transformer needed to be in the center of the
16 trailer.
17     Q. And just so I understand that, the center of
18 gravity mark may or may not coincide with the physical
19 center of the object being hauled; correct?
20     A. Correct.
21     Q. And in this case it didn't; right?
22     A. Correct.
23     Q. But the objective is to get the center of
24 gravity on the center line of the trailer?
25     A. Correct.

Exhibit C    25 (Pages 94 to 97)
Page 4 of 5

Page 266

1  I guess I'll take charge of the originals, take them
2  back to Anchorage, get copies of the new exhibits today
3  for everybody, and have them delivered to you on --
4      MR. MATTHEWS: Monday is fine.
5      MR. PFIFFNER: I'll try to get them delivered on
6  Friday actually.
7      And I'll have the Exhibit 36 recopied, as
8  well, in accordance with the way that Mr. Longacre
9  described.
10     MR. LONGACRE: Sounds good to me. Can we get
11 this marked -- this first page of the original file
12 marked as 36. We all agree we don't need the jacket?
13     MR. MATTHEWS: The original exhibits, once
14 they've been copied, are they going back to the court
15 reporter, or are we keeping them?
16     MR. PFIFFNER: My proposal is that we keep them
17 and have them traveling with the court reporters
18 throughout the case, but I will make sure that the
19 court reporter here gets a set of the exhibits so that
20 the record will be complete, if that's okay with
21 everybody.
22     MR. LONGACRE: Sounds okay for me.
23     MR. MATTHEWS: Okay. So at the end of each
24 deposition, we'll just need to make sure it's clear
25 who's got the original exhibits in the stack.

Page 267

1      MR. LONGACRE: Do we have the original from
2  yesterday?
3      MR. MATTHEWS: Yeah.
4      MR. LONGACRE: Okay. Are we done?
5      MR. MATTHEWS: So we are --
6      MR. LONGACRE: Off record.
7      MR. MATTHEWS: -- concluded.
8      Signature I assume?
9      MR. LONGACRE: Yes.
10     MR. MATTHEWS: I need a copy.
11     MR. PFIFFNER: I want a copy, and I want full
12 copy but also an ASCII in a format that I can put it on
13 Summation Blaze.
14     MR. WILHELM: Same thing. Copy and condensed.
15     MR. PFIFFNER: Same thing here. Condensed.
16     MR. MATTHEWS: Can I have an E-trans.
17     MR. PFIFFNER: Send me an E-trans instead of
18 ASCII.
19     (4:32 p.m.)

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF LOS ANGELES  )

I, KIRK MARTIN, hereby certify under penalty of perjury under the laws of the State of California that the foregoing is true and correct.
Executed this _____ day of _____, 2007, at _____, California.

_____
KIRK MARTIN

REPORTER'S CERTIFICATE

I, JEANINE CURCIONE, C.S.R. NO. 10223, RPR, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth.

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings.

I further certify that I am not interested in the event of the action.

Witness my hand this _____ day of _____, 2007.

_____
Certified Shorthand
Reporter for the
State of California

Exhibit C
Page 5 of 5

68 (Pages 266 to 269)